## DORA F. HOOK *vs.* WASHINGTON G. L. GEORGE.

In an action for breach of a promise of marriage, the declaration alleged that the parties agreed to marry each other and the plaintiff was always ready to marry the defendant, but that he refused to marry her. The answer admitted the mutual agreement, and alleged that the defendant offered to fulfil his promise, but that the plaintiff refused to fulfil hers except on new and unreasonable conditions. *Held,* that instructions to the jury were erroneous, that, if the defendant promised to marry the plaintiff and failed to fulfil his promise, the burden was on him to justify his failure on the grounds he alleged.

In an action for breach of a promise of marriage made at a certain time, previous conversations of the parties on the subject of a marriage between them are admissible in evidence, as showing the relations of the parties, under instructions limiting their competency to the question whether there was an actual contract of marriage at the time relied on, although in his answer the defendant admits the making of such a contract at that time.

In an action for breach of a promise of marriage made at a certain time to be executed at a later time, evidence that between the two times the plaintiff showed the defendant a letter which she had received from a woman to whom the defendant had once been engaged, inquiring about the plaintiff's engagement with him, and that he dictated her reply; and also the letter itself; is admissible to show the relations of the parties, and, in connection with other evidence, to show that the defendant was acting in bad faith towards the plaintiff.

On exceptions to the admission in evidence of written statements of a witness for the purpose of contradicting him, the court will not consider their weight, if it is apparent that they conflict with his testimony in their spirit and general purport.

CONTRACT for breach of a promise of marriage. Writ dated August 16, 1867. The declaration alleged " that the plaintiff and the defendant mutually promised to marry each other, and she has always been ready to marry the defendant, but the defendant refuses to perform his promise," &c. At September term 1869 of the superior court, after the decision reported 100 Mass. 331, the defendant was allowed to amend his answer so as to allege " that he does not deny, but admits that he did promise to marry the plaintiff, about the month of November 1866 ; that he did not refuse to marry the plaintiff, but was ready and willing, and before said action was commenced offered to fulfil said promise, and tendered the performance thereof, but the plaintiff unreasonably refused to fulfil said promise on her part ; that the plaintiff refused to fulfil and consummate said promise on her part, except on terms and conditions which were unreasonable and no part of the original agreement, and which could not fairly

be required of or complied with by the defendant; that the defendant provided a suitable house and place of residence, and the plaintiff refused to go there to reside, or to marry the defendant if he intended or purposed to go there and reside; that the plaintiff refused to marry the defendant if he took his own daughter, being a girl of tender years, to wit, of fifteen years of age, to reside with him, or kept her in his family; and that the plaintiff was otherwise unreasonable in the interposition of claims and demands which were no part of the original promise, and required that the defendant should comply with them as conditions of her fulfilment of her part of the promise or agreement; and so the defendant says that he was always ready and willing to fulfil the promise made by him, but the plaintiff was unwilling to fulfil the promise made by her."

At the new trial at December term 1870 of the superior court, before *Putnam,* J., the only promise of marriage relied on by the plaintiff was the one admitted by the defendant to have been made by him in November 1866. The plaintiff testified, as a witness in her own behalf, that the defendant was a shoe manufacturer, and she worked for him, stitching shoes by the job, at Amesbury, from 1858 to 1864, when he ceased to do business on his own account. She was then asked " whether at any time, and when first, the defendant conversed with her upon the subject of marriage." The defendant objected to any evidence on this subject relating to any time before November 1866; but the judge admitted it " as showing the relations between the parties," and afterwards, upon request of the defendant, the jury were instructed " that this evidence was only competent upon the question whether there was an actual engagement in November 1866, and could be used for no other purpose."

The evidence admitted under the objection tended to prove that in the winter of 1861–2 the defendant informed her that his wife had obtained a divorce from him, and promised to marry her as soon as he could obtain leave to marry again from the court; that she thereupon agreed to marry him whenever he could legally marry; that from this time, while he continued in business, she exercised some authority therein, superintended some of his

workwomen and was intrusted by him at times with money and securities; that in 1864, after he had given up business, he brought her an order on a bank for bonds of the value of $5000, saying to her " that he was travelling about a good deal and some accident might happen to him, and in such case he wished her to go and get these bonds for herself and as her own ; " that in March 1865 he said to her that he had been advised by counsel that the court would not grant him leave to marry again, and he thought it was not right to keep her bound by her conditional promise any longer; and that she then released him, after which he gave her a check for $1000, saying to her " that she had helped him to make his property and ought to have a share of it ; " that soon afterwards she returned to him the order for the bonds by his request ; that between that time and July 1866 he admitted to her that he had become engaged to a Miss Anastasia Doe, and she told him that she did not wish him to visit her again if that was so ; that in July 1866 he told her that his engagement with Miss Doe was broken off, and proposed a renewal of his engagement with herself, and said that he proposed to make an effort to obtain leave to marry, and she assented to his proposal and renewed the engagement upon the former conditions; that in November 1866 he informed her that he had obtained leave to marry ; and that from that time forward they were conversing about and preparing for marriage in the coming spring.

The plaintiff also testified, under objection, that in August 1866 she received a letter from Miss Doe, asking questions in regard to her renewed engagement with the defendant; that she gave the letter to the defendant, and he dictated or wrote an answer, which he told her to copy and send ; and that she asked him why Anastasia wrote, and he said he supposed she did so to make trouble. It appeared that Doe's letter was lost or destroyed, and the plaintiff was allowed to state its substance. The plaintiff offered the letter, as tending " to show the relations between the parties, and also to show, in connection with other evidence, that the defendant was acting in bad faith towards the plaintiff ; " and it was admitted under objection. It was not dis-

puted that the defendant had married another woman than the plaintiff since November 1866 and before the bringing of this action; and the plaintiff put in evidence a letter written to herself by the defendant under date of March 24, 1867, in which, referring to an interview between himself and the plaintiff, he stated that he was pained at the sentiments she expressed about his daughter, and had come to the conclusion that their marriage would not be happy and that it would promote their mutual happiness to separate, and therefore asked to be relieved from his engagement to marry her.

The defendant contended and testified that, at his last interview with the plaintiff, about March 18, 1867, upon his expressing an intention to reside upon his farm in Amesbury and take his daughter to live with him, the plaintiff declared "her fixed purpose not to consent to either of these things," and "that she would not marry him if he was going to the farm to live or if he was going to take the daughter to live with him." But the plaintiff testified that she expressed her unwillingness to live at the farm on the ground that she did not wish to live in the same town with the defendant's first wife, and that she did express dislike of his daughter and said she did not think she could live pleasantly with her under the circumstances; but that she never made any conditions, and never said that she would not marry the defendant under any circumstances.

Emma Carr, a witness for the defendant, testified that she knew of the first engagement between him and the plaintiff; that the plaintiff told her afterwards that she and the defendant had separated, and said " that they both agreed to part, that they had talked the matter over and thought it would be better to do so ; " that in May 1867 the plaintiff showed her the defendant's letter of March 24, 1867, and the witness asked her if she was going to answer it; that the plaintiff said, " No, the best way was to treat it with silent contempt ; " and that the plaintiff then said that she would not marry the defendant and live with his daughter ; and the witness believed that the plaintiff said that she had said so to the defendant. The plaintiff, in reply, offered in evidence a letter written to her by the witness under date of

October 28, 1867. The defendant objected, but so much of the letter as is printed in the margin * was admitted and read to the jury " for the purpose of contradicting the witness in reference to her above statement."

Susan F. Brown, another witness for the defendant, who was her uncle, testified " that she knew of the first conditional engagement between the parties ; that the plaintiff told her that it was broken off by mutual consent ; that she knew of the time when the defendant got leave to marry, and knew of the new engagement and of its being broken ; that she knew of it in June 1867 ; that the plaintiff showed her the defendant's letter of March 24, 1867 ; that the plaintiff spoke of the defendant's daughter and said she would not live with her, and further said that the engagement was broken because she would not live with her and would not go on the farm to live ; that the witness asked why she did not go there and then use her influence to go somewhere else afterwards ; and that the plaintiff called the daughter a damned bitch, and uttered very opprobrious names, and said she would not have her live with her ; that the witness heard her say this, and use such terms before June 1867 and afterwards." The plaintiff, in reply, offered in evidence two letters written to her by the witness, " to contradict her testimony, and as tending to show that the plaintiff could not have made the statements to the witness above testified to by her." These letters, dated respectively April 7, 1867, and July 28, 1867, were

---

* " Amesbury, October 28, 1867. Friend Dora, Jo saw George the other day, he said he looked rather blue, he told him he understood he had got married, he said yes, but he never mentioned anything about you at all, but Mose George said that Wash had better settle with you before the court, he told Jo that you had got him where the wool is short and he would advise him to settle with you if he could, he thinks that you will get a good part of his money, but Alice George says that he has made over all his property to her and you can't get any of it, but everybody says she is a darn liar, Han Wadleigh was up to Haverhill last week to see George about some boots, and she says that it is everybody's opinion that Wash has served you darn mean and they all think up there that you are doing just right."

admitted under the defendant's objection, and are printed in the margin.*

The plaintiff was allowed to testify, in reply to the defendant's case, "that there never was a time when she was not willing to marry the defendant, with or without conditions." The judge instructed the jury, among other things, "that the plaintiff had no right to impose either of the conditions, if they were satisfied

---

* "April 7, 1867.   Dora!  If we could have things as we wish, what wouldn't we enjoy?   Since tea, I have shed just a few silent tears, all unseen, not the first, alone.   I thought of the past, the present, and dared not give hardly a thought of the future.   Is this world treacherous, or the people in it? This world is cruel, this world is untrue, our foes are many, our friends are few. I have just again read that letter inclosed to me.   Well, Dora, it is hard, and cruel to bear, and God knows that I pity you.   I would never have thought; but we may expect anything nowdays.   But, Dora, I should rather have him make up his mind now that he would not agree with what I said, than to have trouble after marriage.   You may yet see that it is all for the best; yet it is painful to bear.   Hear me talk.   I should be just fool enough to feel twice as bad as I ought; but it is nature.   What can I do, or you?   I wish I could have power over the men and influence them as I like; there would be more justice than there now is.   What misery they cause!"

"July 28, 1867.   Well, Dora, I am going to tell you about Wash.   This week I found out the whole thing, by accident at first.   He was in here, and speaking of getting married.   I told him I'll bet he was intending to be married before he came in again, and if he was I should think he might tell me; so he owned up.   Then after that conversation Jenny came in the shop one day; so I asked her, and she told me how soon it was and that her things were all ready.   That Friday she was here, Wash got a horse and carried her home, and asked me if I wanted to go down with them and bring the horse back, as he stayed; so I went, and she showed me her wedding things.   Oh, Dora, isn't it surprising, the change.   I could hardly believe that it was so. At times it goes through me like an arrow.   But I must say that her dress and each suit was splendid.   She is tall, and her dress trails considerably; it is 58 inches long, the skirt.   They will be married next week, I expect, if they have any friends at the house.   He said he wanted me to come; so I suppose he will send for me.   Wasn't I a fool?   But, Dora, I cried Saturday, sitting at my machine, I felt so bad.   I shall feel very bad to go, knowing all and your misery; but shall, I suppose.   I'll bet I shall almost cry through the ceremony. Write me soon all the news.   Now, Dora, don't kill yourself mourning, for it is unjust for you to be treated so, but strike out and see what you will do in the line of matrimony."

that the farm was a suitable place to reside upon, and if the daughter was a suitable person to reside with them;" but " that, if they were satisfied that the promise to marry was made by the defendant, and that there had been a failure on his part to fulfil it, the burden of proof was on him to show that such failure and refusal was justified on the grounds stated." The jury found for the plaintiff with damages in the sum of $3708.33, and the defendant alleged exceptions. No copy of Miss Doe's letter of August 1866 to the plaintiff, or of her answer to it, was made part of the bill of exceptions; nor did the bill state the " other evidence " in connection with which Miss Doe's letter was offered as tending to show bad faith of the defendant. The whole of the defendant's letter of March 24, 1867, to the plaintiff, which was annexed to the bill, is printed in the former report of the case in 100 Mass. 332.

*J. C. Perkins & W. C. Endicott*, for the defendant.

*S. B. Ives, Jr.*, for the plaintiff.

AMES, J. The plaintiff alleges in her declaration, that she and the defendant were engaged to be married to each other; that she was always ready on her part to fulfil the engagement; and that the contract was broken by the defendant. All these are material averments, as to which the burden of proof is upon her. The answer of the defendant admits that the promise was made, but in all other respects it is, in our judgment, a mere denial of her allegations. It is true that it contains several averments, which in form and expression appear to be affirmative in their nature, but which on examination will be found to be merely a circumstantial and detailed negative, as to two material elements of her case. He alleges in his answer, that, although he was ready and offered to fulfil his engagement, she insisted on new and unreasonable conditions, and refused to marry him if they were to live in the house which he had selected, and if his daughter was to live in the family with them. It does not appear to us that this answer had any effect of shifting the burden of proof, or that it was in the nature of confession and avoidance. On the contrary it was mere denial. The readiness to fulfil the contract on her part which she avers, and was bound to prove,

must be constant, unconditional and absolute. When he therefore says in his answer that her readiness to marry him was coupled with the condition that she was not to live in the house that he had provided, and that the daughter was not to live with her, he merely denies that she was ready to fulfil her promise according to the terms of her declaration. It was not enough therefore for her to prove that the promise was made, and that he did not fulfil it; for her offer to fulfil the engagement may have been accompanied with conditions that would justify his refusal. Apparently one of the most important controversies in the case was whether she did impose the conditions alleged in the answer. Upon this point the evidence conflicted, and the jury were erroneously instructed in substance that the burden of proof was on the defendant.

The proof of the conversations of the parties previous to their engagement in 1866 was properly admitted, for the purpose for which the court allowed it; and it also had a bearing upon the subject of damages. The letter from Miss Doe, received after the engagement, was not only the subject of a conversation between the parties, but, as the defendant dictated an answer to it, it was virtually a part of the conversation, and was admissible for the purposes for which it was allowed.

The letters from the two witnesses, Emma Carr and Susan F. Brown, were offered on the ground that in their spirit and general purport they were in conflict with the testimony given by those witnesses. They were competent and admissible for that purpose, whatever might be thought of their weight and importance.

The error in the ruling as to the burden of proof however appears to us to render a new trial necessary, and upon that single point the                                              *Exceptions are sustained.*