HORATIO N. SLATER *vs.* JOHN GUNN & others.

Worcester.　November 8, 9, 1897. — March 28, 1898.

Present: KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Trespass on Land — Equity Jurisdiction — Finding of Master — Way by Pre-*
*scription and Dedication — Great Pond — Colony Ordinance — Right of*
*Access to Pond over Private Land.*

A bill in equity, in aid of an action at law for trespass on the plaintiff's land, al-
leging that the defendant has so trespassed on many occasions, and threatens to
continue such acts regardless of the plaintiff's rights, and is insolvent and un-
able to satisfy an execution for damages, may be maintained to restrain the
defendant from committing further acts of trespass.

The master, to whom a suit in equity to restrain the defendant from trespassing on
the plaintiff's land bordering upon a great pond had been referred, found that
for more than one hundred years there had been a well known and defined road-
way extending from the town or public way across a certain railroad location
over and along the plaintiff's land to a larger tract, which with his land consti-
tuted a certain point, so called; that said roadway had been used and travelled
by hunters, fishermen, picnic parties, celebrators on public occasions, and by
whomsoever chose, without objection and without obstruction, until the plaintiff
erected a barrier across the road and prevented the defendant from entering
thereon; and then stated that he did not find that this travel had been of a
nature, or an extent, or under a claim of right, which would give the public an
easement by prescription over said roadway as a public way. *Held,* that the
facts found by the master were not inconsistent with a finding that the public
had not acquired a right of way by prescription, and did not, as matter of law,
show that there was a public way by dedication.

The provision of the Colony ordinances of 1641 and 1649, that "it shall be free for
any man to fish and fowl" on great ponds, and to "pass and repass on foot
through any man's propriety for that end, so they trespass not upon any man's
corn or meadow," was intended to limit the passing and repassing to unimproved
and unenclosed lands lying on the ponds, and is to be construed with reference
to the condition of things existing when the ordinances were adopted.

A person has no right to cross, without permission, the land of another for the pur-
pose of gaining access to a great pond upon which it borders, in order to cut and
carry away ice therefrom, without being deemed guilty of trespass.

BILL IN EQUITY, filed December 30, 1890, in the Superior
Court, alleged to be in aid of an action at law for trespass on
the plaintiff's land in Webster, and praying that the defendants
may be enjoined " from committing any further acts of trespass "
thereon. An injunction was issued in accordance with the prayer
of the bill. The case was referred to a master, exceptions to

whose report were taken by the defendants, and heard and overruled by *Bishop*, J., who, at the request of the parties, reported the case for the determination of this court. The facts appear in the opinion.

*J. S. Gould*, for the defendants.

*F. B. Smith*, for the plaintiff.

MORTON, J. This case comes here on a report from the Superior Court, and the first question is whether there is jurisdiction in equity of the suit. If the result of allowing the bill to be maintained would be to transfer to the equity side of the court the trial of the question whether the defendants were guilty of trespass, as alleged in the bill, and nothing more, then it is clear that, under *Washburn* v. *Miller*, 117 Mass. 376, the bill would have to be dismissed. But previous to the filing of the bill the plaintiff had brought an action at law, and in addition to this the bill alleges that the defendants on many occasions had trespassed on the plaintiff's land, and threatened to continue such acts regardless of the plaintiff's rights, and were insolvent, so that the plaintiff would be unable to collect from them such damages and costs as he might recover in actions at law. The master has found that the defendant John Gunn claims the right to enter on the plaintiff's premises for the purpose of obtaining access to the great pond on which they lie in order to cut and carry away ice therefrom, that previous to the filing of the bill he had trespassed on the plaintiff's premises under this alleged claim of right, and that he is unable to satisfy an execution for damages. It is plain that under such circumstances an action at law will not afford the plaintiff adequate relief, and we think that he is entitled to maintain his bill. The ground on which equity takes jurisdiction in such a case is the inadequacy of the relief afforded by a court of law, and the principle has been applied in numerous cases. *Clark* v. *Flint*, 22 Pick. 231, 238. *Goodson* v. *Richardson*, L. R. 9 Ch. 221. *Smallman* v. *Onions*, 3 Bro. Ch. R. 621. *Wilson* v. *Hill*, 1 Dick. 367. *Winnipiseogee Lake Co.* v. *Worster*, 29 N. H. 433. *Hicks* v. *Compton*, 18 Cal. 206. *Cottle* v. *Harrold*, 72 Ga. 830. *Musselman* v. *Marquis*, 1 Bush, (Ky.) 463. *Stout* v. *Curry*, 110 Ind. 514. *Camp* v. *Bates*, 11 Conn. 51.

The case is distinguishable from *Washburn* v. *Miller*, *ubi supra*.

In that case it did not appear that an action at law had been brought before the filing of the bill, or that the defendant was insolvent so that the damages which might be recovered could not be collected, or that the plaintiff would be irreparably injured unless relief in equity was granted to him.

The defendants contend that the roadway leading from the town way to the premises of the plaintiff across the railroad is a public way, and that they had the right to use it for the purpose of carting ice from the pond, as they were doing at the time of the trespass complained of. If it is not a public way, then the defendants contend that, inasmuch as the pond is a great pond, and cutting and carrying away ice have been recognized as a public use, they had the right under the ordinances of 1641 and 1649 to cross the unimproved land of the plaintiff for that purpose, although the defendant Gunn owned land bordering on the pond.

It is not contended that the public authorities ever laid out the roadway as a public way. The contention is that it has become such by dedication or prescription. The master has found " that for more than one hundred years there has been a well known and well defined roadway extending from the town or public way across what is now the railroad location and railroad land over and along the narrow neck of land in controversy to the larger or main tract of land which with the narrow strip of land constitutes Union Point ; that said roadway has been used and travelled by hunters, fishermen, picnic parties, celebrators on public occasions, and by whomsoever chose, without objection and without obstruction until 1890, when the plaintiff erected a barrier across said road, and prevented the defendant from entering thereon." The master then stated that he did not find that this travel had been of a nature, or an extent, or under a claim of right, which would give the public an easement by prescription over said roadway as a public way. Though stated negatively, we think that this must be regarded as in effect a finding that the public had not acquired a right of way by prescription over the roadway. The defendants argue that this conclusion is inconsistent with what is found as to the nature and extent of the use. We do not think so. For aught that appears, the use which was made by fishermen and others of the roadway may have been with the permission, express or implied,

of the successive owners of the land. There was nothing in the nature of the use described which, as matter of law, required the master to find that it was adverse and under a claim of right, or that the roadway had become a public way by dedication. Except in one deed, where it is evident from other expressions that the word "highway" is used erroneously to describe the roadway, there is nothing in any of the deeds introduced in the plaintiff's or defendants' chain of title which in any way tends to show an intention on the part of their predecessors in title to dedicate the roadway to the public use, or which recognizes any right therein on the part of the public. Even if the master would have been justified in finding an intention on the part of the predecessors in title of the plaintiff to dedicate the roadway to the public use, there was, so far as appears, nothing which, as matter of law, would have required him to find an acceptance on the part of the public authorities, and without that it is clear that the roadway could not become a public way by dedication. *Morse* v. *Stocker,* 1 Allen, 150. *Hayden* v. *Stone,* 112 Mass. 346, 350. *Commonwealth* v. *Coupe,* 128 Mass. 63.

We come then to the remaining question, namely, whether under the ordinances of 1641 and 1649, and the construction which has been given to it, the defendants had a right to cross the plaintiff's land for the purpose of cutting and carrying away ice from the pond without being deemed guilty of trespass.

Various questions have arisen and have been considered in regard to the rights of the public and of individuals in the great ponds, but the question whether the public may cross private lands, and if so to what extent, for the purpose of gaining access to them, does not seem to have been passed upon, though there are various dicta in our decisions in regard to it which tend to show that the right of access is limited to cases where it can be exercised without trespassing on the lands of others. *Coolidge* v. *Williams,* 4 Mass. 140, 144. *West Roxbury* v. *Stoddard,* 7 Allen, 158, 171. *Paine* v. *Woods,* 108 Mass. 160, 173. *Rowell* v. *Doyle,* 131 Mass. 474.

The law relating to great ponds is peculiar to this Commonwealth and to Maine, which was formerly a part of this Commonwealth. The earliest reference to great ponds is found in the Body of Liberties, adopted in 1641 by the Massachusetts Bay

Colony, and is as follows: "Every inhabitant that is an house-
holder shall have free fishing and fowling in any great ponds,
and bays, coves, and rivers, so far as the sea ebbs and flows
within the precincts of the town where they dwell, unless the
freemen of the same town or the General Court have other-
wise appropriated them, provided that this shall not be extended
to give leave to any man to come upon others' property with-
out their leave." Body of Liberties, Art. 16. This, it will be
observed, gave no right to cross the land of others except by
their leave. Afterwards, in 1649, this was amended by a gen-
eral law or ordinance so as to read as follows: "Every inhab-
itant who is an householder shall have free fishing and fowling
in any great pond, bays, coves, and rivers, so far as the sea ebbs
and flows within the precincts of the town where they dwell,
unless the freemen of the same town or the General Court have
otherwise appropriated them. Provided that no town shall ap-
propriate to any particular person or persons any great pond
containing more than ten acres of land, and that no man shall
cross upon another's propriety without their leave otherwise
than as hereafter expressed. The which clearly to determine:
It is declared, that in all creeks, coves, and other places, about
and upon salt water where the sea ebbs and flows, the propri-
etor of the land adjoining shall have propriety to the low water
mark, where the sea doth not ebb above a hundred rods, and
not more wheresoever it ebbs further. Provided that such pro-
prietor shall not by this liberty have power to stop or hinder
the passage of boats or other vessels, in or through any sea,
creeks, or coves to other men's houses or lands. And for great
ponds lying in common, though within the bounds of some town,
it shall be free for any man to fish and fowl there, and may pass
and repass on foot through any man's propriety for that end, so
they trespass not upon any man's corn or meadow." Col. Laws,
1660, (Whitmore's ed.) 170. It is under the concluding sentence
of this section that the defendants claim a right to cross the
plaintiff's land, provided they do no damage, and the master has
found that no damage was done.

The effect of the provision which has been referred to in the
Body of Liberties, and in the ordinance of 1649, was to reserve
the great ponds for the public use. *West Roxbury* v. *Stoddard,*

7 Allen, 158. *Commonwealth* v. *Roxbury*, 9 Gray, 451. *Watuppa Reservoir Co.* v. *Fall River*, 147 Mass. 548. *Attorney General* v. *Revere Copper Co.* 152 Mass. 444.

The uses which the public might make of them were not limited to those named in the ordinance or in the Body of Liberties, or to such as could be made of them at that time. The ponds, like any other property, could be applied to such uses as from time to time they became capable of. Though fishing and fowling only were named, the mention of them did not exclude other uses, and the permission to householders never has been construed as a prohibition to those who were not householders. But, as already observed, the manner in which those who did not own any lands on the ponds could gain access to them never has been expressly considered. It is probable, as was said in *West Roxbury* v. *Stoddard, ubi supra,* "that many and perhaps most of the large ponds have some common land, or a public way of some kind, lying upon or leading to the shore, by which the public have access to them." But, in the absence of such common land or public way, unless provision was made whereby those desirous of doing so could obtain some access to the ponds without being deemed guilty of trespass, the public would or might be excluded in many cases from any benefit of the public reservation. At the time when the ordinances were adopted the territory to which they applied was almost wholly a wilderness. There naturally would be few public ways leading to great ponds. If there was any common land upon them it might be remote and inconvenient. The population was small and scattered. Many, if not most, of the ponds would be surrounded with wild lands. No harm would be done by permitting persons to cross these lands for the purpose of gaining access to the ponds for fishing and fowling, which were the uses for which they were principally resorted to. In view of all these circumstances, it was provided by the ordinance of 1649 that any man who desired to gain access to the ponds for these purposes should be free to "pass and repass on foot through any man's propriety for that end, so they trespass not upon any man's corn or meadow." This, we think, was intended to limit the passing and repassing to unimproved and unenclosed lands lying on the ponds, and is to be construed with reference to the con-

dition of things existing when the ordinance was adopted. It did not create a right of way over such lands on the part of the public, but relieved persons crossing them in the manner and for the purposes named from liability as trespassers, to the end that the public reservation should in no case altogether fail. If it is regarded as establishing a rule of property, the rule is not an inflexible and unvarying one, but it is to be applied with a due regard to existing conditions. As public means of access to the ponds multiply, and the land about the ponds becomes more valuable, it may well be held that a rule which was adapted to earlier and different conditions should suffer a corresponding modification in its application. In cases where there are no convenient means of access, fishermen and hunters, and possibly others, may still pass and repass on foot through wild lands lying upon them for the purpose of gaining access to great ponds. But it hardly could have been intended, we think, that as the uses of the ponds increased the right to cross and recross the unimproved and unenclosed lands lying upon them should increase also, and that such land should be liable to be subjected to a constantly increasing burden. As the ponds became more valuable for the public use, and were resorted to more by the public, means of access naturally would be provided by the public authorities, and there would be less instead of more necessity for crossing private lands. There is some analogy perhaps, as the defendants contend, between land lying on great ponds and land bounding on the sea. But except in the case of land lying between high and low water mark, over which, at the time when private ownership was extended to low water mark, the right of fishery and of passage was expressly reserved, it never has been understood that the public were at liberty to cross private lands lying between a highway and the sea for the purpose of gaining access to the latter. The fact that land is situated on a great pond may furnish a reason — as was said in *Commonwealth* v. *Alger*, 7 Cush. 53, 94, 95, of land bounding on the sea — for holding that under the rule of property established by the ordinance of 1649 it is subject to be more restricted in its use than land situated elsewhere. Accordingly, the Legislature has provided that the Fishery Commissioners in the discharge of their duties may enter upon and pass through

or over private property, and that all persons shall be allowed reasonable means of access to great ponds of more than twenty acres for the purpose of fishing without rendering themselves liable as trespassers. Pub. Sts. c. 91, §§ 9, 11. If it had been understood that under the ordinance the public had a right of access to great ponds over private lands, this legislation would have been unnecessary, except so far as it related to the size of the ponds.

We do not think that any light on the question now under examination can be obtained by considering the rights of the public in the land lying between high and low water mark in tidal waters. At common law, great ponds were unknown as such, and the ownership of land bounding on the sea extended only to ordinary high water mark. By the ordinance of 1649 private ownership was extended in the latter case to low water mark, when it did not exceed one hundred rods, subject to the right of passage over it and of fishing which the public had always had. We fail to see in this, or in the fact that great ponds were named in connection with " bays, coves, and rivers " where " the sea ebbs and flows," anything which tends to show that the right of passage on the part of the public over lands lying on great ponds is to be extended as the uses of the ponds increase, or is to be enlarged beyond what reasonably may be supposed to have been contemplated in view of the conditions existing at the time of the adoption of the ordinance.

The result is that the exceptions taken by the defendants to the master's report must be overruled, and judgment must be entered for the plaintiff in the action at law, and a final decree entered in his favor in this suit embodying the terms of the injunction heretofore issued, in accordance with the terms of the judge's report.

*So ordered.*